## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **MICHAEL WAYNE SWANK,** | : | **Civil No.  3:23-CV-1244** |
| | : | |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **(Magistrate Judge Carlson)** |
| | : | |
| **MARTIN O'MALLEY,**[1] | : | |
| **Commissioner of Social Security,** | : | |
| | : | |
| **Defendant.** | : | |

## MEMORANDUM OPINION

## I.    Introduction

The instant case entails a recurring issue in Social Security appeals: the assessment of an Administrative Law Judge's (ALJ) evaluation of medical opinion evidence. For the ALJ this evaluation is guided by an analytical paradigm which calls upon the ALJ to measure the persuasiveness of the opinions against two yardsticks: consistency and supportability.

Once the ALJ completes this task, on appeal it is the duty of the court to determine whether substantial evidence supports the agency's determination. This

---

[1]    Martin O'Malley became the Commissioner of Social Security on December 20, 2023. Accordingly, pursuant to Rule 25(d) of the Federal Rules of Civil Procedure and 42 U.S.C. § 405(g), Martin O'Malley is substituted for Kilolo Kijakazi as the defendant in this suit.

is a deferential standard of review. With respect to this legal guidepost, as the

Supreme Court has explained:

> The phrase "substantial evidence" is a "term of art" used throughout
> administrative law to describe how courts are to review agency
> factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——,
> 135 S. Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-
> evidence standard, a court looks to an existing administrative record
> and asks whether it contains "sufficien[t] evidence" to support the
> agency's factual determinations. Consolidated Edison Co. v. NLRB,
> 305 U.S. 197, 229, 59 S. Ct. 206, 83 L.Ed. 126 (1938) (emphasis
> deleted). And whatever the meaning of "substantial" in other contexts,
> the threshold for such evidentiary sufficiency is not high. Substantial
> evidence, this Court has said, is "more than a mere scintilla." Ibid.; see,
> e.g., Perales, 402 U.S. at 401, 91 S. Ct. 1420 (internal quotation marks
> omitted). It means—and means only—"such relevant evidence as a
> reasonable mind might accept as adequate to support a conclusion."
> Consolidated Edison, 305 U.S. at 229, 59 S. Ct. 206. See Dickinson v.
> Zurko, 527 U.S. 150, 153, 119 S. Ct. 1816, 144 L.Ed.2d 143 (1999)
> (comparing the substantial-evidence standard to the deferential clearly-
> erroneous standard).

Biestek v. Berryhill, 139 S. Ct. 1148, 1154 (2019).

In the instant case the ALJ was called upon to assess four medical opinions:

two non-examining, non-treating state agency experts who opined in a consistent

fashion that Swank could perform light work; an examining, consulting physician,

whose report provided no function-by-function assessment of Swanks' limitations;

and a treating source opinion which was internally inconsistent and was at odds with

the doctor's own treatment notes. Presented with this opinion evidence, the ALJ

found that the opinions of the state agency experts were more persuasive and

concluded that Swank could perform a range of light work. After a review of the record, and mindful of the fact that substantial evidence "means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Biestek, 139 S. Ct. at 1154, we find that substantial evidence supported the ALJ's findings in this case. Therefore, for the reasons set forth below, we will affirm the decision of the Commissioner.

## II.  Statement of Facts and of the Case

On September 1, 2020, Michael Swank filed an application for a period of disability and disability insurance benefits pursuant to Title II of the Social Security Act, alleging disability beginning June 12, 2020. (Tr. 16). According to this application, Swank was disabled due to the following impairments: chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), and a spine disorder. (Tr. 19). Swank was born on April 3, 1967, and was 53 years old, which is defined as an individual closely approaching advanced age under the Commissioner's regulations, on the alleged disability onset date. (Tr. 24).  He had a high school education and had prior relevant work experience as a carpenter and laborer. (Id.)

A. **<u>Swank's Clinical History</u>**

During the relevant time frame, Swank's primary caregiver was the Bassett Health Care Network, and his principal physician was Dr. David Haswell. Dr. Haswell's treatment notes reveal that Swank began treating with Bassett in November of 2019, after an eight-year treatment hiatus. (Tr. 276). Between November 2019 and May 2020, Swank was seen by medical staff for a variety of minor matters on approximately seven occasions. (Tr. 276-291). The notes of these clinical encounters were largely unremarkable. In particular, on each occasion caregivers noted essentially normal observations in terms of pulmonary function and range of motion. (Tr. 280-81, 282-83, 284-85, 287-88, 291).

In mid-June 2020, Swank had a clinical encounter which, once again, found that his breathing was unremarkable, and he displayed a normal range of motion but reported that Swank was exhibiting tenderness and pain in his back. (Tr. 297-99). Dr. Haswell initially treated this back condition with medication and injection. (Tr. 300). Treatment notes in June and July of 2020, continued to indicate that Swank displayed a normal range of motion and acknowledged some relief of Swank's back pain from medication, but also noted that Swank was reporting back pain. (Tr. 300-11). Dr. Haswell referred Swank to  a spinal specialist, Dr. Emily DeSantis, who

4

examined the plaintiff and reported that she could not complete an examination due to Swank's reported pain levels. (Tr. 314-16).

Swank also underwent MRI and x-rays exams, which revealed some lumbar disc bulging along with "multilevel degenerative changes in the lumbar spine as described, most marked at L4-L5 resulting in moderate to marked central canal stenosis" and "probable bilateral L5 spondylolysis without spondylolisthesis." (Tr. 330). However, treatment notes from October 2020 continued to document a normal range of motion, while recording Swank's reported, persistent back pain. (Tr. 353-54).

On February 3, 2021, Swank's caregivers recommended physical therapy for his persistent back pain. (Tr. 387-88). Swank engaged in physical therapy at College Street Orthopaedics throughout February of 2021. (Tr. 375-81). The reports of this physical therapy were mixed. While providers noted that Swank performed the recommended exercises successfully, they also noted that he consistently complained of back pain, albeit on occasion in vague terms. (Id.) Thus, while Dr. Haswell observed in March of 2021 that Swank received no relief from his back pain through physical therapy, (Tr.391), on May 3, 2021, the doctor indicated that Swank's pulmonary function was unremarkable and despite his back pain he displayed a normal range of motion. (Tr. 445-46).

B. **Medical Opinion Evidence**

Four medical professionals opined regarding the severity of Swank's physical impairments based upon this relatively sparse and equivocal clinical record. Two of these experts were non-treating and non-examining state agency experts. Initially in February of 2021, Dr. Krist opined that Swank could perform a range of light work involving occasionally lifting and carrying up to 20 pounds, frequently lifting and carrying 10 pounds, standing, sitting or walking for up to six hours in a workday; and occasionally crawling, kneeling, crouching, and climbing ladders. (Tr. 58-69). On reconsideration in April of 2021, a second state agency expert, Dr. Baronos, reached similar conclusions finding based upon Swank's clinical records that he could perform a range of light work. (Tr. 77-87).

A consulting, examining source, Dr. Rita Figueroa, reached somewhat different conclusions in November of 2020 following an examination of Swank. (Tr. 365-69). There was an enigmatic and equivocal quality to Dr. Figueroa's report of this examination. According to Dr Figueroa, Swank had a normal gait, could perform heel to toe walking, required no assistive device, and had no difficulty rising from a chair or sitting upon an examination table. (Tr. 366). Swank also was able to perform a full squat, albeit with difficulty. (Id.) Dr. Figueroa's examination revealed some limitations on Swank's spinal flexion cervical spine showing flexion of 45 degrees,

extension 45 of degrees, and rotation 40 degrees bilaterally. Lumbar spine showed flexion 40 degrees and extension 0 degrees. However, Swank displayed a full range of motion in his shoulders, elbows, wrists, hips, knees, and ankles. (Tr. 368). Swank's finger dexterity was intact, and he displayed 5/5 strength bilaterally. (Id.) Based upon this examination narrative Dr. Figueroa opined that Swank would have severe limitations, bending, lifting, and twisting and further opined that he would have difficulty performing tasks that involved moderate to severe exertion. (Tr. 369). While this much was clear from the doctor's report, there was an enigmatic quality to the report since it failed to set forth a function-by-function assessment of Swank's ability to perform work-related tasks, something that is typically included in consultative reports. (Id.)

Swank's treating physician, Dr. Haswell, also submitted a physical impairment questionnaire relating to Swank on July 2, 2021. (Tr. 479-81). This medical opinion reached extreme conclusions regarding the degree of Swank's impairment. In this questionnaire, Dr. Haswell indicated that Swank could only stand and walk for twenty minutes at a time; could sit for thirty minutes at a time; but would require a half hour break every fifteen minutes. (Tr. 480). The doctor also limited Swank to lifting no more than ten pounds, stated that he would miss more than four days of work each month, and indicated that he was limited in his ability

7

to engage in handling and fingering. (Id.) Dr. Haswell's medical opinions, however, were internally inconsistent in some regard. For example, the doctor opined that Swank had a limited ability to engage in fingering and handling, but also stated he could perform these tasks 100% of the time. (Id.) Dr. Haswell also stated that Swank could stand and walk for twenty minutes at a time during the workday but stated that could engage in these activities for zero hours during an eight-hour workday. (Id.) Dr. Haswell's report did not reconcile these inconsistences. Nor did he reconcile these extreme findings with his treatment records which frequently stated that Swank enjoyed a full range of motion.

## C. **The ALJ Hearing and Decision**

It was against this equivocal medical backdrop that Swank's disability claim came to be evaluated by the ALJ on August 25, 2021. (Tr. 31-57). At the hearing, both Swank and a Vocational Expert testified. (Id.) In his testimony Swank provided statements which were at odds with some of the medical opinion evidence provided by his treating source Dr. Haswell. For example, Swank stated that he could carry up to twenty-five pounds for short distances, while the doctor opined that he could carry no more than ten pounds. (Tr. 46). Given these inconsistencies in Dr. Haswell's opinion, the ALJ foreshadowed at the hearing that this opinion, standing alone, was not helpful in terms of a disability analysis. (Tr. 36). The ALJ left the record open

for three weeks in order to enable Swank to supplement the record on this score but received no further medical opinion evidence. (Tr. 16).

Following this hearing, on November 29, 2021, the ALJ issued a decision denying Swank's application for benefits. (Tr. 13-26). In that decision, the ALJ first concluded that Swank met the insured status requirements of the Social Security Act through December 31, 2025, and had not engaged in substantial gainful activity since June 12, 2020, the alleged onset date. (Tr. 18-19). At Step 2 of the sequential analysis that governs Social Security cases, the ALJ found that Swank had the following severe impairments: chronic obstructive pulmonary disease (COPD), obstructive sleep apnea (OSA), and a spine disorder. (Tr. 19). At Step 3, the ALJ determined that Swank did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments. (Tr. 21).

Between Steps 3 and 4, the ALJ fashioned a residual functional capacity ("RFC"), considering Swank's limitations from his impairments, stating that:

> After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform light work, as defined in 20 CFR 404.1567(b), except he cannot climb ladders, ropes, or scaffolds or work at unprotected heights. He can occasionally stoop, balance, crouch, crawl, kneel, and climb stairs and ramps. The claimant requires a brief, two-to-three minute change in position after sitting, standing, or walking for 30 minutes, but he retains the ability to remain on task during the position change. He cannot tolerate concentrated exposure to extreme temperatures, wetness, humidity, or respiratory irritants.

9

(Id.)

Specifically, in making the RFC determination, the ALJ considered the sparse clinical evidence, the medical opinions, and Swank's self-described activities. In particular, with respect to the medical opinion evidence the ALJ found that:

> I am more persuaded by the state agency assessments because they are consistent with one another and the limitations they propose are better defined and more supported by the medical evidence. The claimant's medical records document a history of treatment for COPD, OSA, hypertension, and low back pain (1-2F, 4-6F, 9F). Images of the claimant's lumbar spine have shown degenerative changes at multiple levels, including "mild-to-moderate" central canal stenosis at L3-4, "moderate to marked" central canal stenosis with "marked" right and "mild" left foraminal stenosis at L4-5, and "probable bilateral L5 spondylolysis without spondylolisthesis at L5 (1F/28, 56-57; 5F/4; 9F/6). Dr. Figueroa observed during her exam that the claimant had some difficulty stooping (3F/2). She also noted an increased AP chest diameter; decreased spinal, shoulder, and hip range of motion; positive straight leg raising, and absent patellar and Achilles tendon reflexes (3F). These findings generally support the exertional and postural limitations proposed by Dr. Krist and Dr. Baronos. The environmental limitations proposed by these physicians are also reasonable, given the claimant's history of respiratory disease.

(Tr. 22-23).

As for Dr. Figueroa's medical opinion, the ALJ concluded that:

> I find Dr. Figueroa's assessment less persuasive because it is vague (3F). She does not quantify what she means by "severe limitations" or "moderate to severe" exertion. Furthermore, the level of limitation she proposes does not comport with her objective clinical findings. She observed, for example, that the claimant was in no acute distress and exhibited a normal gait and stance. He could fully squat, albeit with

10

some difficulty, and had no difficulty walking on his heels and toes. He also had no difficulty rising from a chair. The claimant used no assistive device and needed no help changing for the exam or getting on and off the examination table. As mentioned, the claimant's chest AP diameter was increased, but there was no significant chest wall abnormality and his lungs were clear to auscultation, with normal percussion and diaphragmatic motion. His supine straight leg raising was positive at 90 degrees, but unconfirmed in the sitting position. The claimant had full range of motion in his elbows, wrists, knees, and ankles. In his shoulders, he demonstrated 120 degrees of forward elevation, 130 degrees of abduction, 50 degrees of external rotation, and full adduction and internal rotation. In his hips, the claimant had 40 degrees of external rotation and full flexion, extension, internal rotation, backward extension, abduction, and adduction. All the claimant's joints were stable and without tenderness, redness, heat, swelling, or effusion. He had no muscle atrophy or sensory deficits, and he demonstrated 5/5 strength in all four extremities. He also had 5/5 grip strength bilaterally, with intact hand and finger dexterity.

(Id.)

Finally, the ALJ afforded less persuasive force to Dr. Haswell's medical opinion, observing that:

Dr. Haswell completed a physical assessment in which he indicated the claimant could not sustain even "sedentary" exertion (7F). He opined, for example, that the claimant could only "occasionally" lift and carry ten pounds, sit for a total of one hour in 30-minute increments, and stand and/or walk for no more than 20 minutes in an eight-hour day. Dr. Haswell also indicated that the claimant had limitations for repetitive reaching, handling, or fingering. He thought the claimant's symptoms were severe enough to "constantly" interfere with his attention and concentration and cause him to be absent from work more than four times a month. He also indicated that the claimant would need to take 30-minute breaks every 15 minutes, during which he might recline or lie down. I find Dr. Haswell's physical assessment mostly unpersuasive. It is inconsistent both internally and with other evidence

11

in the record. For example, as mentioned, Dr. Haswell indicated that the claimant had limitations for repetitive reaching, handling, or fingering (7F/4). Yet, he also indicated that the claimant could use her upper extremities to reach, handle, and finger 100- percent of an eight-hour workday. As also mentioned, Dr. Haswell opined that the claimant could only "occasionally" lift and carry ten pounds, while the state agency physicians opined he could lift and carry up to twenty pounds "occasionally" (1A, 3A) and the claimant testified he would have no problem lifting and carrying two gallons of milk.

(Id.)

Having arrived at this RFC assessment, the ALJ found that Swank could not return to his past work but could perform work available significant numbers in in the national economy. (Tr. 25-26). Accordingly, the ALJ concluded that Swank did not meet the stringent standard for disability set by the Act and denied this claim. (Tr. 27).

This appeal followed. (Doc. 1). On appeal, Swank contends that the ALJ erred in his assessment of Dr. Figueroa and Dr. Haswell's opinions. This case is fully briefed and is, therefore, ripe for resolution. For the reasons set forth below, and mindful of the deferential standard of review that applies here, we will affirm the decision of the Commissioner.

III.    **Discussion**

    A. **Substantial Evidence Review – the Role of this Court**

When reviewing the Commissioner's final decision denying a claimant's application for benefits, this Court's review is limited to the question of whether the findings of the final decision-maker are supported by substantial evidence in the record. See 42 U.S.C. §405(g); Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 200 (3d Cir. 2008); Ficca v. Astrue, 901 F. Supp.2d 533, 536 (M.D. Pa. 2012). Substantial evidence "does not mean a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988). Substantial evidence is less than a preponderance of the evidence but more than a mere scintilla. Richardson v. Perales, 402 U.S. 389, 401 (1971). A single piece of evidence is not substantial evidence if the ALJ ignores countervailing evidence or fails to resolve a conflict created by the evidence. Mason v. Shalala, 994 F.2d 1058, 1064 (3d Cir. 1993). But in an adequately developed factual record, substantial evidence may be "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent [the ALJ's decision] from being supported by substantial evidence." Consolo v. Fed. Maritime Comm'n, 383 U.S. 607, 620 (1966). "In determining if the Commissioner's decision is

supported by substantial evidence the court must scrutinize the record as a whole."

Leslie v. Barnhart, 304 F. Supp.2d 623, 627 (M.D. Pa. 2003).

The Supreme Court has recently underscored for us the limited scope of our review in this field, noting that:

> The phrase "substantial evidence" is a "term of art" used throughout administrative law to describe how courts are to review agency factfinding. T-Mobile South, LLC v. Roswell, 574 U.S. ——, ——, 135 S.Ct. 808, 815, 190 L.Ed.2d 679 (2015). Under the substantial-evidence standard, a court looks to an existing administrative record and asks whether it contains "sufficien[t] evidence" to support the agency's factual determinations. Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938) (emphasis deleted). And whatever the meaning of "substantial" in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence, this Court has said, is "more than a mere scintilla." Ibid.; see, e.g., Perales, 402 U.S. at 401, 91 S.Ct. 1420 (internal quotation marks omitted). It means—and means only—"such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Consolidated Edison, 305 U.S. at 229, 59 S.Ct. 206. See Dickinson v. Zurko, 527 U.S. 150, 153, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999) (comparing the substantial-evidence standard to the deferential clearly-erroneous standard).

Biestek, 139 S. Ct. at 1154.

The question before this Court, therefore, is not whether the claimant is disabled, but rather whether the Commissioner's finding that she is not disabled is supported by substantial evidence and was reached based upon a correct application of the relevant law. See Arnold v. Colvin, No. 3:12-CV-02417, 2014 WL 940205, at *1 (M.D. Pa. Mar. 11, 2014) ("[I]t has been held that an ALJ's errors of law denote

a lack of substantial evidence") (alterations omitted); <u>Burton v. Schweiker</u>, 512 F. Supp. 913, 914 (W.D. Pa. 1981) ("The Secretary's determination as to the status of a claim requires the correct application of the law to the facts."); <u>see also</u> <u>Wright v. Sullivan</u>, 900 F.2d 675, 678 (3d Cir. 1990) (noting that the scope of review on legal matters is plenary); <u>Ficca</u>, 901 F. Supp.2d at 536 ("[T]he court has plenary review of all legal issues . . . .").

Several fundamental legal propositions which flow from this deferential standard of review. First, when conducting this review "we are mindful that we must not substitute our own judgment for that of the fact finder." <u>Zirnsak v. Colvin</u>, 777 F.3d 607, 611 (3d Cir. 2014) (citing <u>Rutherford v. Barnhart</u>, 399 F.3d 546, 552 (3d Cir. 2005)). Thus, we are enjoined to refrain from trying to re-weigh the evidence. Rather our task is to simply determine whether substantial evidence supported the ALJ's findings. However, we must also ascertain whether the ALJ's decision meets the burden of articulation demanded by the courts to enable informed judicial review. Simply put, "this Court requires the ALJ to set forth the reasons for his decision." <u>Burnett v. Comm'r of Soc. Sec. Admin.</u>, 220 F.3d 112, 119 (3d Cir. 2000). As the Court of Appeals has noted on this score:

> In <u>Burnett</u>, we held that an ALJ must clearly set forth the reasons for his decision. 220 F.3d at 119. Conclusory statements . . . are insufficient. The ALJ must provide a "discussion of the evidence" and an "explanation of reasoning" for his conclusion sufficient to enable

meaningful judicial review. Id. at 120; see Jones v. Barnhart, 364 F.3d 501, 505 & n. 3 (3d Cir.2004). The ALJ, of course, need not employ particular "magic" words: "Burnett does not require the ALJ to use particular language or adhere to a particular format in conducting his analysis." Jones, 364 F.3d at 505.

Diaz v. Comm'r of Soc. Sec., 577 F.3d 500, 504 (3d Cir. 2009).

Thus, in practice ours is a twofold task. We must evaluate the substance of the ALJ's decision under a deferential standard of review, but we must also give that decision careful scrutiny to ensure that the rationale for the ALJ's actions is sufficiently articulated to permit meaningful judicial review.

### B. Initial Burdens of Proof, Persuasion, and Articulation for the ALJ

To receive benefits under the Social Security Act by reason of disability, a claimant must demonstrate an inability to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A); see also 20 C.F.R. §404.1505(a). To satisfy this requirement, a claimant must have a severe physical or mental impairment that makes it impossible to do his or her previous work or any other substantial gainful activity that exists in the national economy. 42 U.S.C. §423(d)(2)(A); 20 C.F.R. §404.1505(a). To receive benefits under Title II of the Social Security Act, a claimant must show that he or she contributed to the

insurance program, is under retirement age, and became disabled prior to the date on which he or she was last insured. 42 U.S.C. §423(a); 20 C.F.R. §404.131(a).

In making this determination at the administrative level, the ALJ follows a five-step sequential evaluation process. 20 C.F.R. §404.1520(a). Under this process, the ALJ must sequentially determine: (1) whether the claimant is engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) whether the claimant is able to do his or her past relevant work; and (5) whether the claimant is able to do any other work, considering his or her age, education, work experience and residual functional capacity ("RFC"). 20 C.F.R. §404.1520(a)(4).

Between Steps 3 and 4, the ALJ must also assess a claimant's residual functional capacity (RFC). RFC is defined as "that which an individual is still able to do despite the limitations caused by his or her impairment(s)." Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (citations omitted); see also 20 C.F.R. §§404.1520(e), 404.1545(a)(1). In making this assessment, the ALJ considers all of the claimant's medically determinable impairments, including any non-severe impairments identified by the ALJ at step two of his or her analysis. 20 C.F.R. §404.1545(a)(2).

There is an undeniable medical aspect to an RFC determination, since that determination entails an assessment of what work the claimant can do given the physical limitations that the claimant experiences. Yet, when considering the role and necessity of medical opinion evidence in making this determination, courts have followed several different paths. Some courts emphasize the importance of medical opinion support for an RFC determination and have suggested that "[r]arely can a decision be made regarding a claimant's residual functional capacity without an assessment from a physician regarding the functional abilities of the claimant." Biller v. Acting Comm'r of Soc. Sec., 962 F. Supp. 2d 761, 778–79 (W.D. Pa. 2013) (quoting Gormont v. Astrue, Civ. No. 11–2145, 2013 WL 791455 at *7 (M.D. Pa. Mar. 4, 2013)). In other instances, it has been held that: "There is no legal requirement that a physician have made the particular findings that an ALJ adopts in the course of determining an RFC." Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006). Further, courts have held in cases where there is no evidence of any credible medical opinion supporting a claimant's allegations of disability that "the proposition that an ALJ must always base his RFC on a medical opinion from a physician is misguided." Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015).

These seemingly discordant legal propositions can be reconciled by evaluation of the factual context of these decisions. Those cases which emphasize the importance of medical opinion support for an RFC assessment typically arise in the factual setting where a well-supported medical source has identified limitations that would support a disability claim, but an ALJ has rejected the medical opinion which supported a disability determination based upon a lay assessment of other evidence. Biller, 962 F.Supp.2d at 778–79. In this setting, these cases simply restate the commonplace idea that medical opinions are entitled to careful consideration when making a disability determination, particularly when those opinions support a finding of disability. In contrast, when an ALJ is relying upon other evidence, such as contrasting clinical or opinion evidence or testimony regarding the claimant's activities of daily living, to fashion an RFC courts have adopted a more pragmatic view and have sustained the ALJ's exercise of independent judgment based upon all of the facts and evidence. See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006); Cummings v. Colvin, 129 F. Supp. 3d 209, 214–15 (W.D. Pa. 2015). In either event, once the ALJ has made this determination, our review of the ALJ's assessment of the plaintiff's RFC is deferential, and that RFC assessment will not be set aside if it is supported by substantial evidence. Burns v. Barnhart, 312 F.3d 113, 129 (3d Cir. 2002); see also Metzger v. Berryhill, No. 3:16-CV-1929, 2017 WL 1483328, at

19

*5 (M.D. Pa. Mar. 29, 2017), <u>report and recommendation adopted sub nom. Metzgar</u> <u>v. Colvin</u>, No. 3:16-CV-1929, 2017 WL 1479426 (M.D. Pa. Apr. 21, 2017); <u>Rathbun</u> <u>v. Berryhill</u>, No. 3:17-CV-00301, 2018 WL 1514383, at *6 (M.D. Pa. Mar. 12, 2018), <u>report and recommendation adopted</u>, No. 3:17-CV-301, 2018 WL 1479366 (M.D. Pa. Mar. 27, 2018).

At Steps 1 through 4, the claimant bears the initial burden of demonstrating the existence of a medically determinable impairment that prevents him or her in engaging in any of his or her past relevant work. <u>Mason</u>, 994 F.2d at 1064. Once this burden has been met by the claimant, it shifts to the Commissioner at Step 5 to show that jobs exist in significant number in the national economy that the claimant could perform that are consistent with the claimant's age, education, work experience and RFC. 20 C.F.R. §404.1512(f); <u>Mason</u>, 994 F.2d at 1064.

The ALJ's disability determination must also meet certain basic substantive requisites. Most significant among these legal benchmarks is a requirement that the ALJ adequately explain the legal and factual basis for this disability determination. Thus, in order to facilitate review of the decision under the substantial evidence standard, the ALJ's decision must be accompanied by "a clear and satisfactory explication of the basis on which it rests." <u>Cotter v. Harris</u>, 642 F.2d 700, 704 (3d Cir. 1981). Conflicts in the evidence must be resolved and the ALJ must indicate

which evidence was accepted, which evidence was rejected, and the reasons for

rejecting certain evidence. Id. at 706-07. In addition, "[t]he ALJ must indicate in his

decision which evidence he has rejected and which he is relying on as the basis for

his finding." Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999).

### C. Legal Benchmarks for the ALJ's Assessment of Medical Opinions

The plaintiff filed this disability application after a paradigm shift in the

manner in which medical opinions were evaluated when assessing Social Security

claims. Prior to March 2017, ALJs were required to follow regulations which defined

medical opinions narrowly and created a hierarchy of medical source opinions with

treating sources at the apex of this hierarchy. However, in March of 2017, the

Commissioner's regulations governing medical opinions changed in a number of

fundamental ways. The range of opinions that ALJs were enjoined to consider were

broadened substantially, and the approach to evaluating opinions was changed from

a hierarchical form of review to a more holistic analysis. As one court as aptly

observed:

> The regulations regarding the evaluation of medical evidence have been
> amended for claims filed after March 27, 2017, and several of the prior
> Social Security Rulings, including SSR 96-2p, have been rescinded.
> According to the new regulations, the Commissioner "will no longer
> give any specific evidentiary weight to medical opinions; this includes
> giving controlling weight to any medical opinion." Revisions to Rules
> Regarding the Evaluation of Medical Evidence ("Revisions to Rules"),
> 2017 WL 168819, 82 Fed. Reg. 5844, at 5867–68 (Jan. 18, 2017), see

20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, the Commissioner must consider all medical opinions and "evaluate their persuasiveness" based on the following five factors: supportability; consistency; relationship with the claimant; specialization; and "other factors." 20 C.F.R. §§ 404.1520c(a)-(c), 416.920c(a)-(c).

Although the new regulations eliminate the perceived hierarchy of medical sources, deference to specific medical opinions, and assigning "weight" to a medical opinion, the ALJ must still "articulate how [he or she] considered the medical opinions" and "how persuasive [he or she] find[s] all of the medical opinions." Id. at §§ 404.1520c(a) and (b)(1), 416.920c(a) and (b)(1). The two "most important factors for determining the persuasiveness of medical opinions are consistency and supportability," which are the "same factors" that formed the foundation of the treating source rule. Revisions to Rules, 82 Fed. Reg. 5844-01 at 5853.

An ALJ is specifically required to "explain how [he or she] considered the supportability and consistency factors" for a medical opinion. 20 C.F.R. §§ 404.1520c (b)(2), 416.920c(b)(2). With respect to "supportability," the new regulations provide that "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(1), 416.920c(c)(1). The regulations provide that with respect to "consistency," "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." Id. at §§ 404.1520c(c)(2), 416.920c(c)(2).

Under the new regulations an ALJ must consider, but need not explicitly discuss, the three remaining factors in determining the persuasiveness of a medical source's opinion. Id. at §§ 404.1520c(b)(2), 416.920c(b)(2). However, where the ALJ has found two or more medical opinions to be equally well supported and consistent with the record, but not exactly the same, the ALJ must articulate how he or she

considered those factors contained in paragraphs (c)(3) through (c)(5). Id. at §§ 404.1520c(b)(3), 416.920c(b)(3).

Andrew G. v. Comm'r of Soc. Sec., No. 3:19-CV-0942 (ML), 2020 WL 5848776, at *5 (N.D.N.Y. Oct. 1, 2020).

Oftentimes, as in this case, an ALJ must evaluate various medical opinions. Judicial review of this aspect of ALJ decision-making is still guided by several settled legal tenets. First, when presented with a disputed factual record, it is well-established that "[t]he ALJ – not treating or examining physicians or State agency consultants – must make the ultimate disability and RFC determinations." Chandler v. Comm'r of Soc. Sec., 667 F.3d 356, 361 (3d Cir. 2011). Thus, when evaluating medical opinions "the ALJ may choose whom to credit but 'cannot reject evidence for no reason or for the wrong reason.'" Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Mason, 994 F.2d at 1066). Therefore, provided that the decision is accompanied by an adequate, articulated rationale, it is the province and the duty of the ALJ to choose which medical opinions and evidence deserve greater weight.

Further, in making this assessment of medical evidence:

An ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion. See Thackara v. Colvin, No. 1:14–CV–00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015); Turner v. Colvin, 964 F. Supp. 2d 21, 29 (D.D.C. 2013) (agreeing that "SSR 96–2p does not prohibit the ALJ from crediting some parts of a treating source's opinion and rejecting other portions"); Connors v. Astrue, No. 10–CV–197–PB, 2011 WL 2359055, at *9 (D.N.H. June

> 10, 2011). It follows that an ALJ can give partial credit to all medical
> opinions and can formulate an RFC based on different parts from the
> different medical opinions. See e.g., Thackara v. Colvin, No. 1:14–CV–
> 00158–GBC, 2015 WL 1295956, at *5 (M.D. Pa. Mar. 23, 2015).

Durden v. Colvin, 191 F.Supp.3d 429, 455 (M.D. Pa. 2016). Finally, where there is

no evidence of any credible medical opinion supporting a claimant's allegations of

disability "the proposition that an ALJ must always base his RFC on a medical

opinion from a physician is misguided." Cummings, 129 F.Supp.3d at 214–15.

### D. **The ALJ's Decision is Supported by Substantial Evidence.**

In this setting, we are mindful that we are not free to substitute our

independent assessment of the evidence for the ALJ's determinations. Rather, we

must simply ascertain whether the ALJ's decision is supported by substantial

evidence, a quantum of proof which is less than a preponderance of the evidence but

more than a mere scintilla, Richardson, 402 U.S. at 401, and "does not mean a large

or considerable amount of evidence, but rather such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion." Pierce, 487 U.S.

at 565. Judged against these deferential standards of review, we are constrained to

find that substantial evidence supported the decision by the ALJ that Swank was not

disabled. Therefore, we will affirm this decision.

At bottom, Swank contends that the ALJ erred in her assessment of the

opinion of the treating and consulting examining sources, Doctors Figueroa and

Haswell. However, we note at the outset that nothing compels an ALJ to uncritically embrace any particular medical opinion. Quite the contrary, it is clear that "[t]he ALJ–not treating or examining physicians or State agency consultants–must make the ultimate disability and RFC determinations." Chandler, 667 F.3d at 361. Further, in making this assessment of medical opinion evidence, "[a]n ALJ is [also] entitled generally to credit parts of an opinion without crediting the entire opinion." Durden, 191 F.Supp.3d at 455.

Here, the ALJ considered the opinion of the treating source, Dr. Haswell, but concluded this opinion was largely unpersuasive. In reaching these conclusions the ALJ noted that the opinion was internally inconsistent, was contradicted in some respects by Swank's own testimony, and was at odds with the many treatment notes which found that Swank possessed a full range of motion. The considerations cited by the ALJ in the assessment of this opinion were valid grounds for discounting the opinion. Thus, an ALJ may discount such an opinion when it conflicts with other objective tests or examination results. Johnson v. Comm'r of Soc. Sec., 529 F.3d 198, 202–03 (3d Cir. 2008). Likewise, an ALJ may conclude that discrepancies between the treating source's medical opinion, and the doctor's actual treatment notes, justifies giving a treating source opinion little weight in a disability analysis. Torres v. Barnhart, 139 F. App'x 411, 415 (3d Cir. 2005). Finally, "an opinion from

a treating source about what a claimant can still do which would seem to be well-supported by the objective findings would not be entitled to controlling weight if there was other substantial evidence that the claimant engaged in activities that were inconsistent with the opinion." Tilton v. Colvin, 184 F. Supp. 3d 135, 145 (M.D. Pa. 2016). In this case, the ALJ cited internal inconsistencies in the medical opinion, discrepancies between the medical opinion and the treating records, as well as other evidence, when finding that this opinion lacked persuasive power. These were valid factors for the ALJ to take into account when assessing opinion evidence and substantial evidence supported the ALJ's evaluation of the treating source opinion. There was no error here.

Moreover, in crafting the RFC in this case, the ALJ properly concluded that Dr. Figueroa's opinion, which was unaccompanied by any function-by-function analysis of the type typically provided by consulting sources, was simply too vague to provide persuasive, detailed proof of the plaintiff's limitations. In contrast, the state agency expert opinions were consistent with one another, and congruent with the treatment records which documented lumbar impairments but suggested that Swank retained a significant range of motion and residual functional capacity notwithstanding these spinal impairments. Therefore, substantial evidence; that is, "'such relevant evidence as a reasonable mind might accept as adequate to support

a conclusion,'" <u>Biestek</u>, 139 S. Ct. at 1154, supported this evaluation of the medical opinion evidence.

In closing, the ALJ's assessment of the evidence in this case complied with the dictates of the law and was supported by substantial evidence. This is all that the law requires, and all that a claimant can demand in a disability proceeding. Thus, notwithstanding the argument that this evidence might have been viewed in a way which would have also supported a different finding, we are obliged to affirm this ruling once we find that it is "supported by substantial evidence, 'even [where] this court acting *de novo* might have reached a different conclusion.' " <u>Monsour Med. Ctr. v. Heckler</u>, 806 F.2d 1185, 1190–91 (3d Cir. 1986) (quoting <u>Hunter Douglas, Inc. v. NLRB</u>, 804 F.2d 808, 812 (3d Cir. 1986)). Accordingly, under the deferential standard of review that applies to appeals of Social Security disability determinations, we find that substantial evidence supported the ALJ's evaluation of this case.

## IV.    **Conclusion**

Accordingly, for the foregoing reasons, the final decision of the Commissioner denying these claims will be AFFIRMED.

An appropriate order follows.

*s/ Martin C. Carlson*
Martin C. Carlson
United States Magistrate Judge

DATED: November 21,  2024